## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————
)
BROCK DOUGLAS DUNHAM,                )
)
Plaintiff,                )
)
v.                                                )          Civil Action No. 10-cv-40246-TSH
)
MICHAEL J. ASTRUE,                        )
Commissioner,                                 )
Social Security Administration,          )
)
Defendant.             )
———————————————————————)


## MEMORANDUM AND ORDER AFFIRMING THE COMMISSIONER'S DECISION
### March 21, 2013


**HILLMAN, J.**

### *INTRODUCTION*

Brock Douglas Dunham ("Dunham") brings this appeal against Michael J. Astrue,

Commissioner of the Social Security Administration ("Commissioner"), for judicial review of

the decision affirming the Administrative Law Judge's ("ALJ") denial of Dunham's application

for disability insurance benefits ("DIB"). Specifically, the ALJ ruled that Dunham's impairments

did not render him disabled under the meaning of the Social Security Act ("Act"). 42 U.S.C. §§

416(i)(1)(A), 423(d)(1)(A). On August 10, 2011, Dunham filed a motion seeking to reverse the

Commissioner's decision or alternatively remand the proceedings to the ALJ and argued that the

ALJ failed to consider or make findings of fact concerning the limiting effects of insomnia,

chronic obstructive sleep apnea, and side effects from prescription medications on Dunham's

residual functional capacity ("RFC")[1] and on his ability to engage in substantial gainful activity ("SGA"). (Docket No. 11) Commissioner filed a Motion to Affirm on the grounds that the ALJ's decision was supported by substantial evidence. (Docket No. 15).

## BACKGROUND

Dunham first applied for DIB on July 8, 2008 alleging his disabling condition began on November 23, 2007.[2] (R. 134). Dunham complained of back and joint pain as well as problems with memory and concentration. (R. 174). On September 5, 2008, the Social Security Administration ("SSA") denied Dunham's application finding a lack of evidence to support his claims. (R. 53-55). Dunham requested reconsideration and on February 2, 2009 the SSA found that although he suffered from certain conditions, they were not severe enough to prevent him from working.[3] (R. 56-59). Dunham then sought a formal hearing before an ALJ. (R. 63). On May 17, 2010, a hearing was held before ALJ Addison C.S. Masengill. (R. 23-50). During that hearing a Vocational Expert ("VE") provided testimony. (R. 45-48). On July 23, 2010, the ALJ issued his decision denying Dunham's claim. (R. 4-20). After the ALJ's denial, the Decision Review Board ("DRB") selected Dunham's case for further consideration. However, because the DRB failed to complete a full-review within the allotted 90-day investigatory period, the ALJ's decision became final.[4] (R. 1-6). After exhausting available administrative remedies, Dunham

---

[1] RFC is defined as: "the most that [the claimant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1).

[2] A copy of the Administrative Record ("R.") has been provided to the Court under seal (Docket No. 8).

[3] The SSA's Notice of Reconsideration noted:
> You are able to perform simple jobs without complex instructions, and ones that do not involve working closely with others. You can be on your feet most of the day. You can lift up to 10 pounds frequently and 20 pounds occasionally. We realize that your condition prevents you from doing your past job, but it does not prevent you from doing other work.

(R. 57).

[4] The DRB notified Dunham on November 5, 2010 and the SSA affirmed the ALJ's decision pursuant to 20 C.F.R. § 405.420(a)(2).

filed a Complaint in this Court on December 7, 2010 (Docket No. 1). This action is now ripe for review under 42 U.S.C. § 405(g). For the following reasons, the Court **GRANTS** the Commissioner's Motion to Affirm the ALJ's decision.

### FINDINGS OF FACT

### 1. Dunham's Personal and Employment History

Dunham was born on September 9, 1971 and resides in Gardner, Massachusetts. (R. 134). Dunham is a high school graduate.[5] (R. 26). Dunham's past relevant work could be characterized as "skilled work" at a medium to heavy exertion level[6] within the plastics industry.[7] (R. 46, 191). Dunham remains unemployed from a layoff in November, 2007, the same month in which his alleged disabling event occurred. (R. 28, 191).

### 2. Dunham's Relevant Medical History

Dunham's relevant ailments were chronic back and shoulder pain, obesity, affective disorder, a somatoform disorder, and sleep apnea.[8] (R. 9, 629-36). His back pain allegedly began

---

[5] There are conflicting accounts with respect to Dunham's educational history. In a Disability Report filed with the SSA on July 14, 2008, Dunham answered "no" to a question asking if he attended "special education" classes during high school. (R. 179). However, when asked the same question by the ALJ on May 17, 2010, Dunham replied that he "was in Special Ed." (R. 26). *See, e.g.*, 20 C.F.R. § 404.1564 ("Education is primarily used to mean formal schooling or other training which contributes to your ability to meet vocational requirements, for example, reasoning ability, communication skills, and arithmetical ability.").

[6] The SSA separates work into five categories by order of physical exertion magnitude: sedentary work, light work, medium work, heavy work, and very heavy work. 20 C.F.R. § 404.1567. Medium work is defined by "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." *Id.* § 404.1567(c). Heavy work is defined by "lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds." *Id.* § 404.1567(d). Workers are considered able to perform any type of work that is lower in physical exertion magnitude than what their current occupation requires, e.g., someone performing heavy work is able to perform medium, light, or sedentary work. *Id.*

[7] Over approximately the last fifteen years, Dunham performed occupations such as: process technician, mechanic, installer, tacker/welder, process technician, and die setter. (R. 191).

[8] Prior to the administrative hearing in front of the ALJ, Dunham was also hospitalized with *diverticulitis*. (R. 34). As a result of this condition, a section of his colon was removed. (R. 34). As it pertains to his ability to perform SGA, however, Dunham testified that any issues he may have had are now resolved. (R. 34).

after an injury during high school athletics more than twenty years ago.[9] (R. 270). His shoulder pain was diagnosed as a mild rotator cuff irritation and labrum tear, commonly known as a "SLAP lesion," although Dunham could not report a definitive event that caused this injury. (R. 293-95). After being laid off, Dunham applied for DIB alleging that his disabling condition occurred on or about November 23, 2007. (R. 28, 134).  In the months between his disabling event and filing this cause of action, Dunham underwent dozens of physical and mental evaluations which are set forth below by year.

### a.  2008

On January 2, 2008, Dr. Katherine Upchurch, a rheumatologist, examined Dunham for back pain and found only a minimal incidence of degenerative changes in his spine and noted that his pain appeared to increase since he stopped working. (R. 307-08). At that time, Dr. Upchurch recommended that Dunham undertake physical therapy, weight loss, and develop proper body mechanics. (R. 308).

Dr. Upchurch saw Dunham one month later on February 29, 2008 and he stated that his pain level was approximately a "3 out of 10." (R. 570). Dr. Upchurch noted Dunham's positive upper-body range of motion, normal gait, good strength, and normal reflexes. (R. 570). Again, the recommended treatment was weight loss and overall body strengthening. (R. 570). Dr. Upchurch examined Dunham on July 7, 2008 where he complained of diffuse back and joint pain. (R. 305). Dr. Upchurch found that Dunham had some pain and limited range of motion in the shoulders but that his neck, elbows, wrists, hands, hips, knees, ankles, and toes all had good ranges of motion. (R. 305).

---

[9] Dunham first sought treatment in June, 1996. (R. 227).

On August 21, 2008, Dr. Kelton Burbank, an orthopedic surgeon, examined Dunham for right shoulder pain. (R. 293). Dr. Burbank found that Dunham's right shoulder had full range of motion and x-rays were negative for any apparent abnormalities. (R. 293). Dr. Burbank, however, ordered an MRI[10] to investigate a potential biceps/labrum tear and rotator cuff irritation. (R. 294). The MRI results confirmed Dr. Burbank's suspicions of a superior labrum tear, but all other areas of Dunham's shoulder were intact. (R. 289). Later on September 22, 2008, Dr. Burbank evaluated Dunham's shoulder and noted Dunham's belief that his current pain prevents him from working as a mechanic but that his back pain inhibits him to a greater degree than his shoulder. (R. 295). Dr. Burbank confirmed the labrum tear, however, the rotator cuff was undamaged. (R. 295). Because shoulder tests continued to reveal a good range of motion, Dr. Burbank recommended that Dunham not undergo surgery as it might worsen his condition given his age. (R. 295).

On December 18, 2008, Dr. Ronald Jolda, an osteopathic physician, examined Dunham for disability determination purposes. (R. 296). Dunham complained of lower back pain, right shoulder pain, and stated that his left shoulder now bothered him as well. (R. 296-97). Dunham had moderate lumbar region muscles spasms. (R. 299). Dunham's concentration and mentation were normal. (R. 297). Dunham had no problems with his speech, eyesight, hearing, moving around, standing on his toes and heels, placing body weight on either leg, walking, and putting on and removing his shoes. (R. 297-98). Dunham had normal range of motion of all joints in the upper and lower extremities. (R. 299). He also had normal range of motion in the cervical,

---

[10] The MRI was performed as an "arthrogram" which uses an injection of a contrast dye to help identify tears in the joint. (R. 293).

thoracic and lumbar regions of his spine. (R. 298-99). Dr. Jolda noted that Dunham's right shoulder was stable but that lifting it above "table height" became painful.[11] (R. 300).

### b.  2009

On January 12, 2009, Dr. Upchurch examined Dunham. (R. 303). Dunham complained of diffuse joint and back pain and sleep apnea. (R. 303). Dr. Upchurch noted that Dunham was obese, had not been to physical therapy in years and had tried stretching several times per week but was not diligent about it. (R. 303). Dunham also stated that he had not worked in over a year. (R. 303). Dr. Upchurch recommended that Dunham return to physical therapy for core strengthening and have Dr. Burbank reevaluate his right shoulder issues. (R. 304). She also noted that Dunham was "disabled" and thus unable to perform occupations requiring repetitive motion of his upper extremities or where he had to sit, stand, walk, stoop or bend for prolonged periods of time. (R. 304).

Later that month, the SSA assessed Dunham's RFC. (R. 313-20). The SSA's report concluded that Dunham could "occasionally" lift up to twenty pounds, "frequently" lift ten pounds and sit, stand or walk for approximately six hours in an eight-hour workday.[12] (R. 314). With respect to postural limitations, Dunham was able to occasionally stoop as well as climb: ramps, stairs, ladders, ropes and scaffolds. (R. 315). Additionally, Dunham could frequently: balance, kneel, crouch and crawl. (R. 315). Dunham was also limited to occasional overhead lifting. (R. 316).

Following the SSA's RFC assessment, Dr. Milton Taylor, Ph.D. performed a psychodiagnostic interview with Dunham (R. 321-25). Dunham complained of back and

---

[11] Dunham complained that he had stopped playing "heavy metal" drums because reaching to hit the cymbals caused discomfort. (R. 300).

[12] "Frequently" means performing a task for approximately two-thirds of the work day while "occasionally" means performing a task for approximately one-third of the work day. (R. 314).

shoulder pain and stated that he could not lift more than twenty pounds and had trouble sitting or standing for extended periods of time. (R. 321). Dunham stated that he was in constant pain from degenerative disc disease and had memory and concentration issues. (R. 321). Dunham also reported that he was depressed, specifically due to marital strife. (R. 322).  He further stated that sleep apnea had forced him to sleep on the couch because it would awaken his wife at night. (R. 323). Dr. Taylor administered a "Mini-Mental Status Exam" testing executive functions such as: naming, repetition, orientation, calculation, visual motor skills and short-term memory. (R. 324). Dunham received a perfect score on the exam, answering all thirty questions correctly. *Id.* Additionally, Dunham demonstrated the ability to complete a routine 3-step command sequence and could read and write a basic sentence. (R. 324). Dr. Taylor's overall diagnostic impressions were that Dunham had both a general pain disorder and adjustment disorder. (R. 325). Dr. Taylor further noted that Dunham believed that his pain disorder would need to be resolved in order to return to work. (R. 325).

On February 2, 2009, Dr. Ginette Langer, Ph.D. performed a psychiatric assessment of Dunham on behalf of the SSA. (R. 326). Dr. Langer noted that Dunham had affective and somatoform disorders, however, these disorders were not severe enough to qualify as "disabled" under SSA listings. (R. 329). Dr. Langer also found that Dunham had a "loss of interest" rather than actual diagnosed concentration issues and that he could perform a variety of daily activities. (R. 338). Dr. Langer also performed a mental RFC assessment of Dunham. (R. 340). Dr. Langer concluded that Dunham's concentration issues were attributable to his pain and depression. (R. 342). Otherwise, Dunham was "not significantly limited" in categories including: understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (R. 340-

41). Furthermore, Dunham could concentrate and remain attentive for at least two continuous hours. (R. 342).

Dr. Upchurch reexamined Dunham on February 3, 2009. (R. 344). Dr. Upchurch did not mention any changes in Dunham's condition from his previous examination a year earlier. (R. 346). Dr. Upchurch concluded that Dunham would be unable to work despite the fact that she could not pinpoint a "definitive diagnosis" for Dunham's pain disorder. (R. 346).

Dr. Burbank treated Dunham again on June 25, 2009. (R. 554). Dunham complained that his shoulder made reaching and clothing himself difficult. (R. 554). Nonetheless, Dunham retained "good, active" range of motion. (R. 554).

On July 13, 2009, Dr. Upchurch evaluated Dunham. (R. 550).  Dunham stated that his pain "comes and goes" and that he has about three "good" days for every "bad" one. (R. 550). Dr. Upchurch noted that Dunham's condition had not significantly changed since his last visit and that she "did not have much more to recommend" in terms of treatment. (R. 551). As she had recommended to him in each prior visit, Dunham was asked to lose weight and perform core strengthening exercises. (R. 551). Furthermore, Dr. Upchurch reiterated that Dunham was disabled and lacked the ability "to work in gainful capacity" unless his pain became more manageable. (R. 551).

On September 30, 2009, Dunham punched a plaster wall and fractured the scaphoid bone in his right wrist. (R. 480, 583). On October 2, 2009, Dr. David R. Fabian placed a cast on Dunham and reexamined him two weeks later. (R. 582-83). On October 29, 2009, Dr. Burbank examined Dunham for increased shoulder pain as a result of the punch. (R. 580).  Besides having a tender biceps muscle, Dunham had good range of motion in his right shoulder. (R. 580). Dr. Burbank noted that Dunham was "grossly neurovascularly intact" and that he needed to remain

in a cast for at least six more weeks. (R. 580). Nonetheless, Dunham's cast was removed on November 11, 2009. (R. 581). The fracture area was still tender. (R. 581). Dr. Fabian recommended a variety of treatment options including surgery or a smaller cast, however, Dunham refused and sought only a thumb splint.[13] (R. 581).

Beginning on October 29, 2009, the Dunham sought outpatient psychiatric treatment at North Central Human Services ("NCHS") for depression-related issues resulting from the recent separation from his wife. (R. 585). Dunham stated on the intake report that his "wife and kids moved out 1 months (sic) ago. I sit around the house, watch TV. No ambition to do anything. Don't want to see anybody. Can't concentrate, can't stay on task." (R. 585). When asked whether he wanted to work, Dunham answered in the affirmative. (R. 587). Dunham was listed as being depressed and sad as well as having a "sleep disturbance." (R. 589). His perception, thought processes, intellectual function, orientation, memory and insight were within normal limits. (R. 589). The clinical interview concluded that Dunham displayed signs of a moderate depressive disorder. (R. 593).

On November 12, 2009, NCHS counselor Mae Reevers interviewed Dunham for an initial fact find. (R. 595). Ms. Reevers' impression was that he was highly emotional and angry at his marital situation. (R. 595). Meeting again on November 16, 2009, Dunham told Ms. Reevers he was having difficulty focusing "on things he needs to do" for himself. (R. 596). Ms. Reevers found that he was depressed as well as worried about his personal finances. (R. 596). On November 23, 2009, Ms. Reevers noted that his depressed mood remained unchanged. (R. 597). On November 30, 2009, Dunham again communicated his anger and depressed mood over his family situation. (R. 598).

---

[13] Regarding Dunham's choice of treatment options, Dr. Fabian remarked that it "would not be my first choice but I have gone with this at his request and he is aware of the potential risks." (R. 581).

On December 3, 2009, Dr. Dianne Lindley-Starr administered a psychiatric evaluation and specifically found that Dunham was "cognitively intact and there was no movement disorder." (R. 600). Dunham's "thinking was logical, relevant and realistic, the conversation was goal directed, and there was no formal thought disorder." (R. 600). Furthermore, medicine prescribed by his primary care physician, Dr. T. Bryan Miller, "worked well, resulted in clearer thinking and focus, but increased depression because he was more aware of his life circumstance." (R. 599). On December 7, 2009, Dunham met with Ms. Reevers but nothing had substantively changed in terms of his depressed mood due to finances and marital strife. (R. 601). A December 14, 2009 meeting with Ms. Reevers revealed that Dunham continued to struggle with depression and anger. (R. 602). A December 17, 2009 report by Dr. Lindley-Starr noted Dunham's medical problems of chronic pain, degenerative joint disease, sleep apnea and hypertension and prescribed Risperdal to combat any anger issues. (R. 603). Dunham also "[d]enie[d] any side effects from current medications." (R. 603). At a December 28, 2009 meeting with Ms. Reevers, Dunham stated that he continued to have marital and focus problems but denied having depression symptoms and noted that he was "sleeping much better." (R. 604).

### c.  2010

Dunham continued psychiatric counseling sessions at NCHS into the following year. On January 11, 2010, Ms. Reevers reported that Dunham showed a notable increase in depression symptoms over his pending divorce and lack of contact with his children. (R. 605). There were, however, no significant changes in his thought process, orientation, behavior or function. (R. 605). On January 14, 2010, Dr. Lindley-Starr met with Dunham and prescribed Risperdal and Larnictal for anxiety and depression. (R. 626). Again, Dunham denied any side effects from his current medications and had no deficiencies in perception, cognition or judgment. (R. 626). A

January 25, 2010 session with Ms. Reevers found no significant change with Dunham's mood, affect, thought process, orientation, behavior, functioning or his pain condition. (R. 622).

Although somewhat "unfocused" during a February 1, 2010 meeting with Ms. Reevers, Dunham's condition was not substantively different than previous therapy sessions. (R. 621). No significant changes were noted at a February 8, 2010 meeting with Ms. Reevers, however, Dunham mentioned that he was socializing more and interacting with his daughters. (R. 620). Signs of depression were apparent at meetings on February 22 and March 8, 2010 where Ms. Reevers noted that the goal of each session was "symptom management." (R. 617, 619). The final counseling session held on March 15, 2010 revealed that Dunham seemed more "forgetful," "overwhelmed," and complained of chronic pain. (R. 616).

### 3. Dunham's Daily Activities

During the relevant period, Dunham's typical day begins when he wakes up between 10:00 AM and 11:00 AM. (R. 38). Dunham remains mostly sedentary during the day, however, he is able to cook, clean, wash laundry, feed the dog and handle financial affairs. (R. 35, 183). Occasionally, he will operate a motor vehicle or motorcycle to do odd-jobs, like driving friends and family to and from work. (R. 183, 186). He "constantly" watched television, played video games and drums, and performed stretches as often as he could. (R. 182, 187). Dunham also stated that he naps several times per day, one of which lasts for approximately an hour. (R. 39, 183). He reported that he finishes tasks that he starts and is able to follow oral and written instructions. (R. 188).

### 4. The ALJ's Decision

The ALJ made the following determinations:

(1) Dunham met the Act's insured status requirements through December 31, 2012 (date when insurance ends).

(2) Dunham had not engaged in SGA since November 23, 2007 (date of alleged onset of disability) (20 C.F.R. § 404.1571 *et seq.*).

(3) Dunham has the following severe impairments: degenerative disc disease; obesity; an affective disorder; and a somatoform disorder (20 C.F.R. § 404.1520(c)).

(4) Dunham did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments under 20 C.F.R. § 404 sub. P, app'x. 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5) Dunham had the RFC to perform light work as defined under 20 C.F.R. § 404.1567(b). Dunham had the following limitations: simple unskilled tasks with no overhead lifting or reaching; no extreme cold/vibration; no heights, ladders, ropes, scaffolding; occasional ramps, stairs, stooping, crouching, crawling; no dangerous moving machinery; moderate mental limitations in maintaining concentration.

(6) Dunham's past relevant work was at a medium to heavy level of exertion according to VE testimony (20 C.F.R. § 404.1565).

(7) Dunham was born on September 9, 1971 and was 36 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. § 404.1563).

(8) Dunham has a high school education and communicates in English (20 C.F.R. § 404.1564).

(9) VE testified that Dunham's job skills could be transferred to other vocations that Dunham had not previously undertaken.

(10) Considering Dunham's age, education level, work experience, and RFC, there are a significant number of jobs that exist in the national economy that he can perform (20 C.F.R. §§ 404.1569 and 404.1569(a)).

(11) Dunham has not been under a disability, as defined under the Act, from November 23, 2007 until the present (20 C.F.R. § 404.1520(g)).

(R. 9-15).

### STANDARDS OF REVIEW

#### 1. Standard for Reviewing the Commissioner's Decision

After reviewing the pleadings and administrative record, this Court may affirm, modify, or reverse the Commissioner's decision with or without remanding the case for rehearing. 42 U.S.C. § 405(g). During the administrative process, the ALJ is required to "deploy[] the correct legal standards and [find] facts upon the proper quantum of evidence." *Roman-Roman v. Comm'r of Soc. Sec.*, 114 F. App'x 410, 411 (1st Cir. 2004). The ALJ's findings of fact shall be conclusive if they are supported by "substantial evidence" which courts have defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Sansone v United States R.R. Ret. Bd.*, 159 F. App'x 210, 211 (1st Cir. 2005) (citing *Richardson v. Perales*, 402 U.S. 389, 399, 91 S. Ct. 1420 (1971)). In applying the "substantial evidence" standard, the court must bear in mind that it is the province of the ALJ, not the court, to find facts, decide issues of credibility, draw inferences from the record and resolve conflicts in the evidence. *See Ortiz v. Sec'y of Health & Human Servs.*, 114 F. App'x 410, 411 (1st Cir. 2004). This also means that "even if the record arguably could justify a different conclusion," the ALJ's determination will still stand. *Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987). Reversing an ALJ's decision is warranted in cases where the ALJ misapplied relevant law, ignored material evidence or made evidentiary conclusions that are left within the purview of an expert witness. *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999). Finally, the Court must "review[] the evidence in the record as a whole" to decide whether the substantial evidence standard was correctly applied. *See Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991).

## 2.   *Standard for Disability Entitlement*

In order to qualify for DIB, claimants must demonstrate that they are disabled under the Act. The Act defines "disability" as having the "inability to engage in any SGA by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant's impairments must be so severe as to prevent them from performing not only past relevant work, but any substantially gainful work that currently exists in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1560(c)(1). Another requirement to receive DIB is that the claimant must prove they were disabled prior to the expiration date of their last insurance policy. 42 U.S.C. § 423(a)(1)(A); *Kemp v. Astrue*, No. 10-40140-TSH, 2012 WL 1085518, at *5 (D. Mass. Mar. 29, 2012) (citing *Brunson v. Astrue*, 387 F. App'x 459, 460 (5th Cir. 2010)).

The appropriate rubric for determining a claimant's disability level is a five-step test under 20 C.F.R. § 404.1520. During an administrative hearing, the ALJ must follow each of these steps sequentially. 20 C.F.R. § 404.1520(a)(4). If at any step the ALJ determines that the claimant is either disabled or not disabled, the investigation immediately terminates. *Id.* If, however, the ALJ is unable to conclusively determine whether a claimant is or is not disabled, the evaluation continues on to the next step in the sequence. *Id.* The process the ALJ must follow is further summarized as follows:

[Step One] If claimant is doing SGA, he is not disabled.

[Step Two] If claimant is not doing SGA, his impairment must be severe before he can be found to be disabled.

[Step Three] If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

[Step Four] If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

> [Step Five] Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

## BURDENS OF PROOF

Throughout the disability determination process, the claimant maintains the burden of persuasion and the burden of production from Steps One through Four. 20 C.F.R. § 404.1512(a); 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the [ALJ] may require."); *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). The claimant must present objective medical evidence demonstrating their impairment. 20 C.F.R. §§ 404.1508, 404.1512. At Step Five, the burden shifts from the claimant to the Commissioner to show that the claimant is capable of performing some occupation existing within the "national economy" which includes any work "in significant numbers either in the region where [the claimant] lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). When making the Step Five determination, the ALJ must assess the claimant's RFC in combination with vocational factors, including the claimant's age, education and prior work experience. 20 C.F.R. § 404.1560(c).

## DISCUSSION

Dunham contends that the Commissioner's decision should be reversed or remanded on three grounds: (1) the ALJ erred by failing to consider the limiting effects of certain impairments on Dunham's RFC; (2) the ALJ erred by failing to properly consider the VE's testimony; and (3) the ALJ erred by improperly considering Dunham's receipt of Unemployment Insurance ("UI") as a credibility factor and for conflating the concept of "total disability" with than SGA.

Conversely, the Commissioner asserts that the ALJ's decision should be affirmed because it is supported by substantial evidence.  The Court now addresses each of Dunham's claims in turn.

### 1.  *The ALJ Applied the Proper Standard to Determine Dunham's Impairments.*

The crux of Dunham's argument is that the ALJ failed to "explain his conclusions" in a satisfactory manner when making the "severity" determination under Step Two[14] and that this mistake laid the foundation for subsequent errors in Step Three and the RFC determination in Step Four. *Pl.'s Br.* at 2; 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. Specifically, Dunham argues that the ALJ failed to apply the correct legal standard and properly support his factual conclusions as to Dunham's impairments with substantial evidence. These arguments fall short for several reasons.

First, "[i]t is well established in this circuit 'that the Step 2 severity requirement is . . . a *de minimis* policy, designed to do no more than screen out groundless claims.'" *Hines v. Astrue*, No. 11-cv-184-PB, 2012 WL 1394396, at *12 (D.N.H. Mar. 26, 2012) (citing *McDonald v. Sec'y of Health & Human Servs.*, 795 F.2d 1118, 1124 (1st Cir. 1986)). "If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end. . . . Rather, it should be continued." SSR 85-28, 1985 WL 56856, at *4. Finally, "[a]s long as the ALJ [finds] at least one severe impairment so that the sequential evaluation progress[es] to the next step, an error at Step Two does not require reversal." *Lawton v. Astrue*, No. 11-cv-189-JD, 2012 WL 3019954, at *7 (D.N.H. July 24, 2012). Thus, it follows logically that if the ALJ resolved Step Two in an appropriate manner, then reversal or remand on that ground would be unnecessary. *See Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987) ("[T]he finding of *any* severe

---

[14] Although Dunham misconstrues the five-step analytical framework, the alleged Step Three error that Dunham refers to is actually covered under Step Two. *Pl.'s Br.* at 3. This error is likely attributable to the ALJ's report that listed Step Two at paragraph 3. (R. 9).

impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two.") (emphasis added).

Here, nothing warrants reversal or remand as an error of law because the ALJ applied the appropriate standard. At Step Two, the ALJ found that Dunham did in fact have certain severe impairments, i.e., degenerative disc disorder, obesity, affective disorder and a somatoform disorder. (R. 9). Once the ALJ determined that Dunham had a severe impairment, he was required to consider the effects of *any* impairment in the subsequent steps irrespective of severity. 20 C.F.R. § 404.1545(e). Thus, reversal or remand is unwarranted because ALJ continued to analyze Dunham's case under the proper legal standard.

Second, substantial evidence supports the ALJ's conclusion that the limiting effects from Dunham's impairments were not credible despite the fact that impairments like insomnia, sleep apnea and side effects from prescription medication were not expressly stated in the final written report. ALJs are permitted to "consider all the evidence without directly addressing in [their] written decision[s] every piece of evidence submitted by a party." *NLRB v. Beverly Enters.-Mass., Inc.*, 174 F.3d 13, 26 (1st Cir. 1999); *Rodriguez v. Sec'y of Health & Human Servs.*, No. 90-1039, 1990 WL 152336, at *1 (1st Cir. Sept. 11, 1990) ("An ALJ is not required to expressly refer to each document in the record, piece-by-piece."). Thus, although Dunham has the right to a fair and impartial decision, he has no basis to reverse or remand that decision simply because he wants a more "perfect opinion" that details each and every grievance he might have. *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) (noting that "[n]o principle of administrative law or common sense requires us to remand a case . . . unless there is reason to believe that the remand might lead to a different result"). Furthermore, the ALJ's failure to specifically include these

ailments in the final analysis is at best harmless error. *See Hickman v. Comm'r of Soc. Sec. Admin.*, 399 F. App'x 300, 302 (9th Cir. 2010).

In any event, assuming, arguendo, that there could be a basis to fault the ALJ's Step Two determination, substantial evidence in the Record reflects otherwise. Dunham contends that certain sleep disorders, had they been properly considered by the ALJ, present grounds for reversal or remand. In reality, Dunham was diagnosed with moderate sleep apnea and merely the potential for insomnia under the sleep study administered by the Heywood Hospital Respiratory Care Department. (R. 630) ("Moderately advanced sleep apnea, probably superimposed on some degree of insomnia or maybe just the patient's response to sleep lab environment."). On another occasion, Dunham mentioned that he was actually sleeping better. (R. 604). Moreover, the ALJ's final decision specifically mentions sleep apnea and concluded that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 13).

With regards to side effects from prescription medication, Dunham testified that he had bouts with nausea and dizziness. (R. 35, 38, 178). *See, e.g.*, *Burns v. Barnhart*, 312 F.3d 113, 131 (3d Cir. 2002) ("Drowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references *serious* functional limitations.") (emphasis added); *Lacroix v. Barnhart*, 352 F. Supp. 2d 100, 115 (D. Mass. 2005) (noting that the claimant's failure to develop the record beyond mere mentions of prescription medication side effects did not warrant reversal of ALJ's determination). The Record belies Dunham's testimony. On several occasions, Dunham denied having any side effects from prescription medication whatsoever. (R. 588, 599, 603, 624-26). Furthermore, any alleged functional limitations due to prescription medication side effects were offset by Dunham maintaining "better than average

activities of daily living." (R. 13, 27-28, 35-36, 41-43, 183, 187, 323); *see also Teixeira v. Astrue*, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) ("[E]vidence of daily activities can be used to support a negative credibility finding.") (citing *Berrios Lopez v. Sec'y of Health & Human Servs.*, 951 F.2d 427, 429 (1st Cir. 1991)). Thus, reversal or remand is unwarranted because substantial evidence supports the conclusion that impairments such as sleep apnea, insomnia and side effects from prescription medication did not render Dunham more limited than found by the ALJ.

### 2. *The ALJ Did Not Err in Considering the VE's Testimony.*

At Step Five, the ALJ presented the VE with two hypothetical scenarios involving a claimant designed to parallel Dunham's general characteristics. Dunham contends that because the ALJ relied on the first hypothetical to the exclusion of the second, his disability determination is not supported by substantial evidence and must be reversed or remanded. Specifically, Dunham alleges that the ALJ failed to consider the limiting effects of sleep apnea.

In Hypothetical One, the ALJ asked the VE to assume the following facts:

- A thirty-eight year old individual with a high school degree and fifteen years of skilled experience as a machine operator, maintenance mechanic, supervisor and welder that operated with a medium to heavy level of exertion.

- The individual would further be limited to tasks that:
  o Were simple and unskilled, requiring no overhead lifting or reaching;
  o Had no more than incidental exposure to extremes in temperature and vibration;
  o Did not require using ladders, ropes, or scaffolding;
  o Did not require working around dangerous, moving machinery; and
  o Required only occasional, i.e., no more than one-third of the time, use of ramps, stairs, stooping, crouching, or kneeling.

(R. 47). The VE testified that none of Dunham's past relevant work would fit into Hypothetical One because it described an individual with light, unskilled work experience while Dunham had worked in jobs that were skilled and required a medium to heavy exertion level. (R. 47).

Nevertheless, the VE listed several occupations that would represent the type of work described in Hypothetical One: (i) *packer or sorter* (800,000 in U.S. labor market; 19,000 in Massachusetts labor market); (ii) *bench assembler* (1.1 million in U.S. labor market; 14,000 in Massachusetts labor market); (iii) *order checker* (250,000 in U.S. labor market; 4,900 in Massachusetts labor market). (R. 47-48).

In Hypothetical Two, an addendum to Hypothetical One, the ALJ asked the VE to assume additional limitations on a claimant that has:

- Chronic pain; potential side effects from medication; and such an individual would need to be "off task," i.e., not working, for up to twenty-five percent of the workday.

(R. 48). The VE testified that such an individual, with those added limitations, would be unable to find any position existing in significant numbers that would be considered SGA under the Act. (R. 48).

The ALJ can consider VE testimony as relevant evidence so long as it is supported by substantial evidence. *See Garay v. Sec'y of Health & Human Servs.*, No. 94-1515, 1995 WL 54077, at *1 (1st Cir. Feb. 10, 1995) (per curiam). "When presenting a hypothetical to a vocational expert, the question must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant." *Aho v. Comm'r of Soc. Sec.*, No. 10-40052-FDS, 2011 WL 3511518, at *7 (D. Mass. Aug. 10, 2011) (internal citations and quotations omitted). "[I]n order for a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities." *Arocho v. Sec'y of Health & Human Servs.*, 670 F.2d 374, 375 (1st Cir. 1982).

The ALJ did not err in relying exclusively on the VE's response to Hypothetical One which did not include the limiting effects of sleep apnea. To reiterate, it is squarely within the

province of the ALJ to make factual and credibility determinations. *See Teixeira*, 755 F. Supp. 2d at 347 (noting that an ALJ's "credibility determination—based on observations of the claimant, evaluation of her demeanor, and consideration of how her testimony fits in with the record evidence—is entitled to deference, especially when supported by specific findings"). Furthermore, the ALJ "is free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence." *See Osenbrock v. Apfel*, 240 F.3d 1157, 1164-65 (9th Cir. 2001). Here, because the ALJ determined that any sleep related impairments were not supported by substantial evidence at Step Two, there was no reason to further consider these impairments with respect to the VE's testimony under Step Five. Accordingly, and for the reasons set forth above, substantial evidence supports the finding that sleep apnea did not render Dunham more limited than found by the ALJ.

### 3. The ALJ Did Not Err in Considering Dunham's Receipt of UI.

Dunham finally contends that the ALJ erred during Step Four by improperly considering his receipt of UI while contemporaneously applying for DIB in assessing Dunham's credibility. Dunham also faults the ALJ for applying the incorrect legal standard when he conflated Dunham's receipt of UI as being "inconsistent with *total disability*" rather than SGA. (R. 13). In support of this contention, Dunham directs the Court to an internal SSA policy memorandum designed to remind ALJs that receipt of UI does not preclude claimants from seeking DIB. *Pl.'s Br. Ex. 3*. Nevertheless, nothing contained in that memorandum bars ALJs from considering a claimant's receipt of UI as a *factor* in determining disability. *See Gladwin v. Astrue*, No. C12-0017, 2012 WL 5448335, at *10 (N.D. Iowa Nov. 7, 2012) (receiving UI creates the presumption that a claimant is "ready, willing, and able to work, which is compelling and seriously undermines [the] assertion that [they are] incapable of working in competitive employment").

Here, the ALJ considered Dunham's receipt of UI as one of many independent bases for finding him not disabled. (R. 13). Furthermore, substantial evidence confirms the ALJ's conclusion because Dunham testified that he actively pursued opportunities in his previous field of maintenance work. (R. 29). Finally, the argument that the ALJ's use of term "total disability" rather than SGA establishes an error in applying the correct legal standard and therefore grounds for reversal or remand is meritless because at best this type of gaffe is harmless error. *See Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008) ("There is no indication that the ALJ would have decided differently . . . and any error by the ALJ was therefore harmless."). Accordingly, because the ALJ considered Dunham's receipt of UI in an appropriate manner, reversal or remand is unwarranted.

## CONCLUSION

For the foregoing reasons, I find that the determinations of the ALJ and Commissioner were analyzed under the proper legal standards and were supported by substantial evidence contained in the Record. Accordingly, Dunham's Motion for Reversal or Remand to the ALJ (Docket No. 11) is **DENIED** and Commissioner's Motion to Affirm the ALJ's Decision (Docket No. 15) is **GRANTED**.


IT IS SO ORDERED.


/s/ *Timothy S. Hillman*
TIMOTHY S. HILLMAN
UNITED STATES DISTRICT JUDGE